**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE *EX PARTE* APPLICATION OF FUNDO DE INVESTIMENTO EM DIREITOS CREDITORIOS NÃO PADRONIZADOS – DJF<br><br>FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No.:1:26-mc-8 |

**MEMORANDUM OF LAW IN SUPPORT OF FUNDO DE INVESTIMENTO EM DIREITOS CREDITORIOS NÃO PADRONIZADOS' *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

Dated: January 07, 2026.

**MB SCANLON PLLC**
*/s/Gabriela Menna Barreto Scanlon*
Gabriela Menna Barreto Scanlon
4301 50th Street, N.W, 1st Floor
Washington, D.C. 20016
Tel: +1 215 459-1171
Email: gabriela@mbscanlon.com

.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................3

PRELIMINARY STATEMENT..............................................................................1

I - FACTUAL BACKGROUND ..............................................................................3

     A. The Parties         …………………………………………………………….3

     B.  Relevant Non-Parties (the "Mesquita Family" Members) .......................................4

     C. The Bank Credit Instruments Issued in Favor of Comércio Biguaçú and
         Solar Comércio...............................................................................................5

     D. The Complex Network of Domestic and Foreign Entities to Shield the
         Mesquita's Assets from their Creditors.....................................................6

     (a)The Brazilian Entities ...........................................................................................6

     (b)The Shell Companies ...........................................................................................10

     E.        The Fraudulent Transactions to Shield the Mesquita's Estate ......................11

II - THE FOREIGN PROCEEDINGS ..................................................................12

     A.        The First Enforcement Lawsuit..............................................................12

     (i)        The First Proceeding to Pierce the Corporate Veil...........................14

     B.        The Second Enforcement Lawsuit.........................................................15

     (ii)        The Second Proceeding to Pierce the Corporate Veil......................16

     C.        The Probate Proceeding ........................................................................17

     D.        Respondents Possess Highly Material Information For Use in the
         Foreign Proceedings................................................................................18

ARGUMENT .........................................................................................................19

I.        THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS
     OF 28 U.S.C. § 1782(a) AND THE *INTEL* DISCRETIONARY FACTORS. .........19

         A.        Petitioner Satisfies the Statutory Requirements of 28 U.S.C. §
             1782.................................................................................................21

         *1.        Respondents Are "Found" in the Southern District of New York.* ...........21

**2.** ***The Requested Discovery is "For Use" In a Foreign Proceeding.*** ........... 22

**3.** ***Petitioner is an "Interested Person".*** ........................................................ 24

**B.** **Discretionary Factors Weigh in Favor of Petitioner's Application.** .................................................................................................. 24

**1.** ***Respondents Are Not and Will Not Be Participants in the Brazilian Proceedings.*** ............................................................................. 24

**2.** ***The Brazilian Court is Receptive to U.S Judicial Assistance.*** ................... 25

**3.** ***This Application Does Not Circumvent the Rules of the Brazilian Authorities and Courts.*** ................................................................................ 26

**4.** ***The Application is Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure*** ........................... 27

**II.** **THE PETITIONER SEEKS THE APPLICATION TO BE GRANTED *EX PARTE*** ...................................................................................................... **29**

**CONCLUSION** ............................................................................................... **30**

# TABLE OF AUTHORITIES

*Brandi-Dohrn v. IKB Deutsche Industriebank AG.*
  673 F.3d 76, 80 (2nd Cir. 2012).................................................................. 15, 17, 20

*Certain Funds, Accounts and/or Invesment Vehicles v. KPMG, LLP.*
  798 F.3d 113, 120 (2d Cir. 2015).............................................................. 17

*Esses v. Hanania*
101 F.3d 873, 874 (2d Cir. 1996)................................................................ 23

*Euromepa S.A. v. R. Esmerian, Inc.*
51 F.3d 1095, 1097 (2d Cir. 1995)............................................................. 15, 19

*Gorsoan Ltd. V. Bullock*
  652 F. App'x 7, 9 (2d Cir. 2016) .............................................................. 18

*Gushlak v. Gushlak*
  486 Fed. Appx. 215, 217 (2d Cir. 2012)................................................... 23, 24

*In re Accent Delight Int'l Ltd..*
  No. 16-MC-125 (JMF), 2018, WL 2849724, at * 4 (S.D.N.Y. June 11, 2018)................. 17, 20

*In re Aquino Chad.*
  No. 19 Misc. 261, 2019 WL 2502060, at *3 (S.D.N.Y. June 17, 2019).................................. 16

*In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in Foreign Proceeding*
134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015).............................................................. 18, 19

*In re Application of Gianoli.*
  3 F.3d 54, 55 (2d Cir. 1993)...................................................................... 23

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery.*
  121 F.3d 77, 78 (2d Cir. 1997)................................................................... 14, 15, 20

*In re Application for an Order Pursuant to 28 U.S.C. § 1782*
773 F.3d at 457–58 ............................................................................................

*In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*
  No. 15-MC-417 (LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) ........................ 21

*In re Bernal,*
  18-21951-MC, 2018 WL 6620085 (S.D. Fla. Dec. 18, 2018) ................................. 23

*In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings*
No. 18-MC-00047 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018)........................... 18

*In re Bourlakova,*
No. 24-MC-71 (JPO), 2024 WL 4839047, at *1 (S.D.N.Y. Nov. 20, 2024)........................... 22

*In re Doosan Heavy Indus,, & Constr. Co., Ltd.*
2020 WL 1864903, at 1 (E.D.N.Y. Apr. 14, 2020) ................................................................ 15

*In re Edelman*
295 F.3d 171, 179-80 (2d Cir. 2002) ................................................................... 15, 21

*In re Gemeinschaftspraxis Dr. Med. Schottdorf,*
No. Civ. M19-88 (BSJ), 2006 U.S. Dist. LEXIS 94161, at *1 (S.D.N.Y. Dec. 29, 2006)....... 23

*In re Guo*
965 F.3d 96 (2d Cir. 2020)...............................................................................................................

*In re Investbank PSC,*
No. 20 MISC. 260 (AT), 2020 WL 8512850 (S.D.N.Y. Dec. 30, 2020)................................... 16

*In re Lane.,*
2022 WL 16737132, at *2 .................................................................................................... 16

*In re Letter of Request from Supreme Court of Hong Kong*
138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991) ................................................................ 23

*In re Mota*
No. MC 19-00369 (MN), 2020 WL 95493, at *1 (D. Del. Jan. 8, 2020) ................................. 23

*In re Pimenta*
942 F. Supp. 26 1282 (S.D. Fla. 2013) .................................................................. 16

*In re Request for Int'l Jud. Assistance From the Nat'l Ct. Admin. of the Republic of Korea*
No. C15-80069 MISC LB, 2015 WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015)................... 23

*In re Sargeant,*
278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017)................................................................ 16

*In re Safra,*
2022 WL 3584541 ............................................................................................................ 19

*In re W. Afr. Min. Trading Ltd,*
No. 24 MISC. 114 (DEH), 2024 WL 3862293, at *5 (S.D.N.Y. Aug. 19, 2024) ................... 22

*In re Ex Parte Application of Claudio Denis Maksoud, No. 1:25-cv-04188 (S.D.N.Y. 2025)* …………………………………………………………………………………………………………*20*

*Intel Corp. v. Advanced Micro Devices, Inc.*
 542 U.S. 241 (2004) ........................................................................................ passim

*Licci c. Lebanese Can. Bank, SAL*
 20 N.Y. 3d 327 (2012) ............................................................................................. 3

*Mees,*
 793 F.3d at 291, 299 ....................................................................................*passim*

*Matter of Colombo Agroindustria S.A.,*
 22-21670-MC, 2022 WL 2167719 (S.D. Fla. June 16, 2022) ................................ 16

*Schmitz.,*
 376 F.3d at 84 ...................................................................................................... 19

**Statutes**

28 U.S.C. § 1782............................................................................................ passim

Fundo de Investimento em Direitos Creditórios Não Padronizados (the "Petitioner") respectfully submits this Memorandum of Law in support of its *ex parte* Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order authorizing the Petitioner to issue and serve subpoenas *duces tecum* on: the Clearing House Payments Company LLC ("CHIPS") and on the Federal Reserve Bank of New York ("FED-NY") (together, the "Respondents") for use in foreign proceedings pending in Brazil. The Proposed Order is attached hereto as Exhibit A. The proposed form subpoenas are attached hereto as Exhibit B.

The pertinent facts set forth herein are supported by the Declaration of Petitioner's Brazilian attorney, Mr. José Eduardo Tavanti Júnior,[1] attached hereto as Exhibit C.

## PRELIMINARY STATEMENT

This Application seeks evidence for use in four pending proceedings in Brazil (collectively, the "Foreign Proceedings"). These proceedings include: (1) enforcement lawsuit no. 0013943-12.2013.8.26.0008, pending with the 4th Civil Court of the Tatuapé Regional Forum – São Paulo State Court,[2] (2) enforcement lawsuit no. 0013944-94.2013.8.26.0008,[3] pending with the 5th Civil Court of the Tatuapé Regional Forum – São Paulo State Court (together the "Enforcement Lawsuits"); (3) a civil proceeding to Pierce the Corporate Veil N. 0004905-58.2022.8.26.0008[4]; (4) a civil proceeding to Pierce the Corporate Veil No. 0007893-52.2022.8.26.0008,[5] (together the "Proceedings to Pierce the Corporate Veil").

---

[1] Exhibit C - Declaration of Petitioner's Brazilian attorney in support of the Application will be referenced as the "Tavanti's Declaration."

[2] The "First Enforcement Lawsuit," attached to the Tavanti's Declaration as **Exhibit 5**.

[3] The "Second Enforcement Lawsuit," attached to the Tavanti's Declaration as **Exhibit 6**.

[4] The "First Proceeding to Pierce the Corporate Veil," attached to the Tavanti's Declaration as **Exhibit 7**.

[5] The "Second Proceeding to Pierce the Corporate Veil," attached to the Tavanti's Declaration as **Exhibit 8**.

The Enforcement Lawsuits were originally filed by Banco Votorantim S/A ("Banco Votorantim"), the original creditor, against Comércio de Veículos Biguaçu Ltda. ("Comércio Biguaçu") and Solar Comércio de Veículos Ltda. ("Solar Comércio") (together, the "Debtors").

The enforcement proceedings sought to enforce bank credit instruments ("BCIs")[6] against the Debtors and their guarantors: Válter de Souza Mesquita, Ricardo de Souza Mesquita, Rodrigo Odilon Guedes Mesquita, and Swan Serviços Administração e Participação Ltda. ("Swan") [7] (together, the "Guarantors").

On May 30, 2022, Banco Votorantim and the Petitioner, represented by Jive Asset Gestão De Recursos Ltda, executed a credit assignment agreement[8] pursuant to which Banco Votorantim assigned its rights and claims against the Debtors to the Petitioner. As a result of the assignment, the Petitioner succeeded Banco Votorantim as the plaintiff in the Enforcement Lawsuits.

As of the date of this Application, the Debtors and the Guarantors continue to represent to the Brazilian courts that they have no assets to pay for their debt. Significant judicial efforts to locate assets belonging to the Debtors and the Guarantors had already been undertaken. Those efforts revealed no assets, or assets insufficient to satisfy the outstanding debts.[9]

The Petitioner observed that the Guarantors' ostentatious lifestyle was inconsistent with their representations of insolvency in the Enforcement Actions.

This inconsistency prompted the Petitioner to conduct an independent investigation. That investigation revealed a complex network of corporate entities incorporated in Brazil and in

---

[6] Four (4) BCIs were issued in favor the Debtors. The BCIs issued in favor of Comércio Biguaçú - BICs no. 10146940 and no. 10151640 - are attached to the Tavanti's Declaration as **Exhibit 2**. The BCIs issued in favor of Solar Comércio - BICs no. 10116451 and no.10151641 - are attached to the Tavanti's Declaration as **Exhibit 3**.

[7] Swan is a guarantor in The First Enforcement Lawsuit.

[8] The Assignment Agreement is attached to the Tavanti's Declaration as **Exhibit 04.**

[9] Tavanti's Decl. ¶25.

multiple foreign jurisdictions. The entities were structured to conceal assets and to place them beyond the reach of Brazilian courts and creditors.

Consequently, based on these findings, the Petitioner filed requests in each Enforcement Action seeking to pierce the corporate veil with respect to shell companies incorporated and controlled by Válter.[10] Each request gave origin to a proceeding to pierce the corporate veil of the Debtors, which runs in parallel with the enforcement lawsuits.

Therefore, this Application seeks evidence to be used in the foreign proceedings pending in Brazil to show that the Guarantors have misrepresented facts in these proceedings, and that the Guarantors, in fact, have assets to pay the debts owed to the Petitioner—assets that have been concealed through a network of domestic and foreign entities and transactions beyond the reach of the Brazilian courts' jurisdiction. The discovery sought from the Respondents will support the Petitioner's claims and assist in bringing the pending matters to resolution.[11]

## I - FACTUAL BACKGROUND

### A. The Parties

***Fundo de Investimento em Direitos Creditórios Não Padronizados, ("Petitioner").*** The Petitioner is a private investment fund that specializes in distressed assets and structured funds in Brazil. The Petitioner invests in high-risk, complex receivables, offering potentially higher yields but intended for investors able to handle volatility, low liquidity, and legal exposure.[12]

***Jive Asset Gestão De Recursos Ltda* ("JIVE").** JIVE is a Brazilian asset management firm that represents and manages the Petitioner and is specialized in distressed assets and structured funds.

---

[10] Tavanti's Decl ¶12.

[11] Tavanti's Decl ¶62

[12] Tavanti's Decl ¶8

JIVE focuses on the origination, acquisition and recovery of non-performing loans, distressed real estate, and legal claims.[13]

***The Clearing House Payments Company* ("CHIPS").**  CHIPS is headquartered in New York, New York[14] and is the largest private sector US-denominated dollar clearing system in the world, clearing and settling $1.5 trillion in domestic and international payments per day.  It processes and maintains records of payment messages between banks.[15]

***Federal Reserve Bank of New York* ("<u>FED-NY</u>").**  The Federal Reserve Bank is headquartered in New York, New York.[16]  As a provider of the Fedwire Funds Service through its wholesale product officer, the FED-NY also acts as a wire-transfer clearinghouse for U.S. dollar-denominate wire transfers between domestic and international banks.[17]

### B.  Relevant Non-Parties (the "Mesquita Family" Members)

***Válter de Souza Mesquita.***  Válter is a Brazilian citizen residing in São Paulo.  He is one of the Guarantors of the BCIs and a shareholder of multiple entities in Brazil and abroad, including in the United States.  Válter is also the father of Alexandre Mesquita and Daniel Mesquita.

***Ricardo de Souza Mesquita.***  Ricardo is a Brazilian citizen, Válter's brother and one of the Guarantors of the BCIs.  Ricardo previously held ownership interests in Comércio Biguaçú, Solar Comércio, and other shell companies in Brazil.

---

[13] Tavanti's Decl ¶8

[14] The Clearing House Payment Company L.L.C. has its registered office located at 1114 Avenue of The Americas, 17th Floor, New York, New York 10036. *See* https://www.theclearinghouse.org/terms-and-conditions.

[15] *See* https://www.investopedia.com/terms/clearing-house-interbank-payments-system-chips.asp.

[16] The Federal Reserve Bank of New York has its Head Office at 33 Liberty Street, New York, New York, 10045. *See* https://www.newyorkfed.org/contacts.

[17] *See* https://www.newyorkfed.org/aboutthefed/org_financial.html.

***Rodrigo Odilon Guedes Mesquita***.  Rodrigo is a Brazilian citizen, the father of Válter and Ricardo, and an original shareholder of Comércio Biguaçú.  Rodrigo is also one of the Guarantors of the BCIs issued in favor of Solar Comércio.

### C. The Bank Credit Instruments Issued in Favor of Comércio Biguaçú and Solar Comércio

In 2011 and 2012, Banco Votorantim issued two BCIs (Nos. 10146940 and 10151640) in favor of Comércio Biguaçú, in the aggregate amount of R$ 5,515,000.00.[18]  In 2012, Banco Votorantim also issued two additional BCIs (N. 10116451 and 10151641) in favor of Solar Comércio, totaling R$ 1,614,000.00, which shares the same shareholders as Comércio Biguaçú— Válter and Ricardo.[19]

The BCIs issued in favor of Comércio Biguaçú list Válter, Ricardo and Swan Serviços, signing as Guarantors of the debt, expressly waiving the benefit of order of payment.  The parties also entered into an assignment agreement ("*Instrumento Particular de Constituição de Penhor de Estoque nº 107617-8*"), under which Comércio Biguaçú's inventory, corresponding to vehicles, was pledged as a collateral for the debt.[20]

A similar situation was in place in relating to the BCIs issued in favor of Solar Comércio, in which Válter, Rodrigo Odilon, Ricardo and Comércio Biguaçú appeared as guarantors of the debt.[21]

In 2013, after amendments to the original BCIs, through which the Debtors sought to renegotiate the payment schedule of the debt, the maturity date of the BCIs was accelerated

---

[18] Tavanti's Decl ¶16.

[19] Tavanti's Decl ¶17.

[20] The Assignment Agreement is attached to the Tavanti's Declaration as **Exhibit 04**.

[21] Tavanti's Decl ¶19 (*see* the chart illustrating all the BCIs, including their dates, amounts, and relevant details).

because the Debtors and Guarantors failed to fulfill certain payment obligations.[22]  As a result, on July 18, 2013, Banco Votorantim filed the Enforcement Lawsuits.[23]

The Enforcement Lawsuits have been pending for several years.  Banco Votorantim made multiple attempts to serve the Debtors and the Guarantors with process and efforts to locate their assets have been, thus far, unsuccessful.  This, however, is not compatible with their lifestyle, as further explained.

### D.  The Complex Network of Domestic and Foreign Entities to Shield the Mesquita's Assets from their Creditors.

The Petitioner conducted a thorough background and asset search on the Debtors and the Guarantors.  The searched yielded many pictures of Válter in international trips, enjoying a lavish lifestyle, in luxury hotels and restaurants.[24]  His son, Daniel Mesquita, also shared pictures from international trips and is currently living in Miami, Florida.  Válter's other son, Alexandre Mesquita, graduated from one of the most expensive private universities in Brazil, Fundação Armando Alvares Penteado, and pursued a master's degree at Middlesex University, in the United Kingdom.[25]  From 2018 up to 2022, Alexandre lived in London, Miami, and New York.[26].

### (a) The Brazilian Entities

Válter and Ricardo created an extensive network of related companies in Brazil and abroad to conceal their assets and shield the family estate from their creditors and, potentially,

---

[22] Tavanti's Decl ¶20.

[23] According to clause 13 of the BCI's, these instruments can be directly enforced by an enforcement action. *See* **Exhibit 2** and **3.**

[24] Tavanti's Decl ¶26.  *See also* **Exhibit 7**– Initial filing of the First Proceeding to Pierce the Corporate Veil, in which a collection of pictures showing Válter's international trips can be found.

[25] Tavanti's Decl ¶27.

[26] *See* https://www.linkedin.com/in/alexandre-mesquita-1728a584/.

from Brazilian authorities[27]. This scheme reflects a sophisticated effort to conceal assets, as supported by the documents attached to the Application.

In Brazil, this scheme was set in motion with the incorporation of the holding companies Santa Albana Empreendimentos e Participações Ltda. ("Santa Albana") and Mônaco Empreendimentos e Participações Ltda. ("Mônaco").[28]

The first company incorporated by Válter to conceal the family's assets was Santorini Empreendimentos e Participações Ltda., today named Santa Albana Empreendimentos e Participações Ltda ("Santa Albana"). Santa Albana was incorporated on December 31, 2002, when Válter incorporated R$ 1,571,561.47 (Brazilian *reais*) in the company's capital stock[29]. Shortly thereafter, with no reason, Válter left the company as a shareholder and was replaced by Ankara Capital S/A ("Ankara"), a company incorporated in the British Virgin Islands.[30] After the corporate switch, there were several changes to Santa Albana's corporate structure, all of which were orchestrated by Válter.[31]

On June 04, 2004, Parola International S.A. ("Parola") joined the company as shareholder, and, on December 12, 2008, Parola and Ankara were replaced by Donald Group Enterprises S.A. ("Donald Group") and Kenkove International Inc. ("Kenkove"), which then became the current shareholders of Santa Albana.[32] These two companies are linked to the Panama Papers and have Válter as their intermediary.

---

[27] Tavanti's Decl ¶29,30.

[28] The Brazilian entities Articles of Incorporation are attached to the Tavanti's Declaration as **Exhibit 10**.

[29]Tavanti's Decl ¶31.

[30] Tavanti's Decl ¶32.

[31] Tavanti's Decl ¶33.

[32] Tavanti's Decl ¶34.

On November 06, 2002, Wancet Empreendimentos E Participações Ltda., or Monaco Empreendimentos e Participações Ltda. ("Mônaco"), was incorporated by Wanda de Souza Mesquita, Válter's and Ricardo's mother, and Ricardo himself.[33]

Only a few years later, following the same *modus operandi* used in Santa Albana, the two original shareholders left the company on March 30, 2004, and were replaced by Bernson S/A/ ("Berson") and Florming Marketing S/A. ("Florming").  Sometime later, Orchard left and was replaced by Kenkove, the same shareholder of Santa Albana.[34]

As of the date of this Application, Mônaco's shareholders are Kenkove and Elverton. Together with these companies, other entities incorporated by the Mesquita family, especially by Válter and Ricardo, were also used to shield their estate through fraudulent transactions.

As previously noted, the fraudulent corporate structure designed by the Guarantors is highly sophisticated and used to shield their assets from the Petitioner.[35]  Nevertheless, the scheme is traceable to the Mesquita, as Válter is the ultimate beneficial owner of the holding companies used to conceal and dissipate his assets.

On November 24, 1983, under the original name of "Biguaçu Empreendimentos Imobiliários Ltda," Válter incorporated Idra Assessoria e Consultoria Ltda. ("Idra").[36]  Idra had Ricardo and Válter as its original shareholders.

---

[33] Tavanti's Decl ¶35.

[34] Tavanti's Decl ¶36,37.

[35] Tavanti's Decl ¶38.

[36] Tavanti's Decl ¶39.

On October 03, 2003, Válter was replaced by Santa Albana and Mônaco. On January 08, 2004, Ricardo left the company and was replaced by Thassos Empreendimentos e Participações Ltda. ("Thassos").[37]

Shortly after Idra was incorporated, the family also incorporated Mataruna Administração e Participações Ltda. (originally named "Locamóvel Administração e Participação S/C Ltda.") ("Mataruna"), which had Rodrigo Odilon, Válter, Ricardo and Flávio de Souza Mesquita as its original shareholders.

On January 20, 2023, the Mesquita family members were substituted in the company's ownership by Mônaco, Santa Albana and Thassos, all entities are related to the family.[38]

Thassos was incorporated on November 06, 2002, by Ricardo, under the original name of Tremblant Empreendimentos e Participações Ltda.  Similarly to what happened to Idra, Ricardo left the company on May 10, 2004, and was replaced by Bernson and Costello Enterprises S.A. Bernson exited the capital structure on February 16, 2009, and was replaced by Orchard, which ultimately left on January 19, 2012, and was replaced by Elverton and Kenkove.[39]

Further evidence of the scheme is that Idra itself appears as the lessor in the lease agreement for the commercial building from which Comércio Biguaçu operated its headquarters. In addition, despite the companies' ostensibly distinct corporate purposes, they share the same administrator—Antônio Geraldo Ferreira Gusmão[40]—who also acts as the Brazilian representative for Válter's offshore entities.  This overlap in control and representation further demonstrates the coordinated structure used to conceal and protect Válter's assets.

---

[37] Tavanti's Decl ¶40,41.

[38] Tavanti's Decl ¶42.

[39] Tavanti's Decl ¶43, 44.

[40] Tavanti's Decl ¶45, 46.

**(b)The Shell Companies**

To further shield his and his family's assets through an even more opaque structure designed to evade creditor scrutiny, Válter also incorporated more than ten additional entities outside Brazil. These entities were incorporated in jurisdictions widely recognized as tax havens— such as Panama and the British Virgin Islands. These foreign entities form part of the broader network used to obscure the location and ownership of assets.[41]

These companies were found due to their links to the Panama Papers scandal, being incorporated by the law firm Mossack Fonseca, which became famous due to their activity of incorporating shell companies to ensuring the concealment of assets and money laundering.[42]

Válter and Ricardo also appeared in the Panama Papers. Between 2002 and 2014, they incorporated 14 companies in Panama, Niue, Samoa, and the British Virgin Islands, which served as the ultimate owners of the Brazilian entities and were used to shield the family's assets from creditors. The companies are fully described and detailed in Tavanti's Declaration.[43]

Importantly, all these offshore companies share critical features that reveal their role in the concealment scheme: all were incorporated through Mossack Fonseca—a firm widely linked to offshore structures used in money-laundering and tax-evasion schemes; each lists Antônio Geraldo Ferreira Gusmão as their representative in Brazil; their directors are individuals who serve as nominal directors for hundreds of other offshore entities; and in every case, Válter acted as the intermediary overseeing their creation and administration.

---

[41] Tavanti's Decl ¶47, 48.

[42] *See* https://www.theguardian.com/news/2016/apr/08/mossack-fonseca-law-firm-hide-money-panama-papers. Last access on November 24, 2025.

[43] Tavanti's Decl ¶50.

Summing up to the entities listed above, Válter also took advantage of his connections with the United States, specifically to Miami, Florida, to additionally incorporate seven entities in the state of Florida.  These entities are:

1.   PELICAN BEACH HOLDING, INC, incorporated on 01/28/2005.

2.   FLAMINGO AMERICAN, INC, incorporated on 03/17/2005.

3.   EAGLE UNITED, INC., incorporated on 03/17/2005.

4.   DOLPHIN UNIVERSAL, INC., incorporated on 06/20/2005.

5.   REUNION ISLAND, INC., incorporated on 09/29/2006.

6.   VENUS ASTRAL CORP., incorporated on 02/10/2009.

I.I   MANATEE BAY UNITED CORP., incorporated on 05/07/2004, having Válter and his son Daniel as directors of the company.[44]

These companies also share similarities.  They all had the assistance of Garry Nelson Attorney, a law firm based in Miami, which has as its partner Garry Nelson.  According to Mr. Nelson's LinkedIn page, he is specialized on "real estate, corporate, international; Brazil, and probate," with an emphasis on *Brazilian clientele*.[45]

Moreover, Manatee Bay United Corp.'s documents show that Daniel and Válter have as their main address, 1900 N. Bayshore Dr Unit 1801, Miami, FL.  This address corresponds to an apartment with market price of $800,000.00.[46]

**E.   The Fraudulent Transactions to Shield the Mesquita's Estate**

---

[44] A copy of the offshores' Articles of Incorporation is attached to the Tavanti's Declaration as **Exhibit 11**.

[45] *See* https://www.linkedin.com/in/garry-nelson-82531925.

[46] *See* https://www.zillow.com/homedetails/1900-N-Bayshore-Dr-APT-1801-Miami-FL-33132/83157193_zpid/; https://miamicoastalliving.com/miami-properties/1900-n-bayshore-dr-1801-quantum-on-the-bay-condo-miami-fl-33132-mls-a11561237-1/305-695-1105/

The incorporation of the Brazilian and foreign entities described above had one purpose: to shield the family's estate from creditors.  These companies were used to perform fraudulent transactions to conceal from authorities and creditors the existence of assets that could have been used to pay the family's debts. [47]

One of these transactions happened in February 2013, when Comércio Biguaçú, only two months before the maturity date of BCI's 10146940 and 10151640, transferred to Santa Albana four real estate properties allegedly in lieu of payment.[48]

Similarly, in 2016, three real estate properties which were owned by Rodrigo Odilon were transferred to Mônaco.

In 2017, two properties originally owned by Comércio Biguaçú were then purchased by Idra and Mataruna to keep the property in the family's possession.  Considering these facts, the Debtors and the Guarantors did conceal assets from the Petitioner.

More recently, the Petitioner also found that Válter's and Ricardo's mother and Rodrigo Odilon's ex-wife, Wanda, had passed away, in the year of 2018, leaving to the heirs a property worth R$ 458,500.78 Brazilian *reais*.

Also, Válter and Ricardo, knowing that the property would be garnished by the Enforcement Lawsuits filed by their creditors, not limited to Petitioner, waived their right to inheritance to the alleged benefit of Flávio in the probate proceeding filed on March 04, 2024.[49]

## II - THE FOREIGN PROCEEDINGS

### A.  The First Enforcement Lawsuit

---

[47] Tavanti's Decl at ¶52,53.

[48] "*Dação em pagamento*" as provided by Articles [356, 357, 358 and 359] of the Brazilian Civil Code.

[49] The initial petition in the Probate Proceeding is attached to the Tavanti's declaration as **Exhibit 16.**

The First Enforcement Lawsuit[50] was filed on July 18, 2013, to enforce BCIs no. 10146940 and no. 10151640[51], for a total amount of R$ 5,045,202.19 Brazilian *reais*, after Comércio Biguaçú and the Guarantors failed to comply with clause 3.7 of the BCIs, which set the payment schedule[52].

Under Brazilian procedural law,[53] a creditor holding a BCI may proceed directly with enforcement, and the claimant was therefore entitled to payment from the debtors.[54]

In its initial filing, the former plaintiff, Banco Votorantim, requested that, if payment was not made within three days, the court attach certain assets owned by Comércio Biguaçú, including its rights in five enforcement proceedings in which it was a creditor.[55]

Banco Votorantim spent years attempting to serve the Debtors and Guarantors, who used false addresses to evade service multiple times. They were finally served by gazette publication on June 29, 2016. Although the Brazilian court repeatedly ordered their assets to be seized, only R$4.04 (Brazilian reais) was found in Válter's accounts.[56]

After years trying to locate assets that could pay for the debt, including by serving the Brazilian stock exchange and other Government agencies to inform whether the debtors had any assets, Banco Votorantim, assigned its credits to the Petitioner. Consequently, on July 04, 2022, the Petitioner became the plaintiff in the First Enforcement Action.[57]

---

[50] The initial filing of the First Enforcement Lawsuit is attached to the Declaration as **Exhibit 5.**

[51] The BCIs 10146940 and 10151640 are attached to the Tavanti's Declaration as **Exhibit 2**.

[52] Tavanti's Decl ¶ 66.

[53] Article 585(VIII) of the former Civil Procedure Code (now Article 784(XII) of the 2015 Code) and Article 28 of Law No. 10.931/04.

[54] Tavanti's Decl ¶ 67.

[55] Tavanti's Decl ¶68,69.

[56] Tavanti's Decl ¶70,71.

[57] Tavanti's Decl ¶72.

On August 03, 2022, after a thorough investigation, the Petitioner requested the court to pierce the corporate veil to reach other companies owned by Válter – Santa Albana, Idra, and Mônaco.  Although initially denied by the Brazilian district court, the request was granted by the São Paulo State Court after Petitioner appealed.[58]

On September 27, 2023, Comércio Biguaçú appealed to the Superior Court of Justice from the São Paulo State Court decision.  The appeal was denied, and a second appeal also was denied.  The final decision in this matter is currently pending.

**(i)      The First Proceeding to Pierce the Corporate Veil.**

As described above, the Proceeding to Pierce the Corporate Veil was filed by the Petitioner on August 08, 2022,[59] and, although initially denied, the order was reformed by the São Paulo State Court.[60]

The Petitioner showed that, while the Guarantors repeatedly denied owning assets and evaded all attempts to locate them, they nonetheless entered into agreements in other cases to pay debts exceeding R$1,000,000.00.  This confirmed that the Guarantors had assets despite claiming insolvency to the Petitioner.

Considering this information, the court not only authorized the proceeding to pierce the corporate veil to proceed, but it also granted Petitioner's request to name an expert to conduct a valuation of Santa Albana's, Idra's, and Mônaco's assets, and how these companies were used to divert and conceal the Guarantors' assets from their creditors.[61]

---

[58] Tavanti's Decl ¶73, 74.

[59] The First Proceeding to Pierce the Corporate Veil is attached to the Tavanti's Declaration as **Exhibit 7.**

[60] The State Court Decision Reforming the District Court's Decision dated February 02, 2023, is attached to the Tavanti's Declaration as **Exhibit 12**.

[61] The Decision Granting the Appointment of a Technical Expert, dated June11, 2024, is attached to the Tavanti's Declaration as **Exhibit 13**.

The expert will evaluate, among other aspects, whether these shell companies are still being controlled by Válter and Ricardo, and how the transactions they performed were conducted to shield the family's assets from their creditors.[62]

The proceeding is in its discovery phase, during which all sorts of evidence may be produced and reviewed by the technical expert. Thus, the need of this Application to provide evidence which will shed light on the fraudulent transactions performed by the Guarantors.

### B. The Second Enforcement Lawsuit

The Second Enforcement Lawsuit is based on the same principles and legal provisions as the First Enforcement Lawsuit. It was also filed on July 13, 2013, after the main debtor, Solar Comércio, and the Guarantors did not pay the debt.[63]

The debts are based on BCIs n. 10151641, issued on December 26, 2012, in the original amount of R$ 114.000,00 Brazilian *reais*, and n. 10116451, issued on May 04, 2011, in the original amount of R$ 1.500.000,00 Brazilian *reais*.[64] Given that the Debtors did not pay on the maturity date, the creditor filed the Second Enforcement Lawsuit to enforce the credit on the main debtor, Solar Comércio, and the guarantors, Válter, Ricardo and Rodrigo Odilon.[65]

As the First Enforcement Proceeding, the Guarantors provided fake and old addresses, evading service. Service of process happened on March 06, 2023, when Válter joined the proceeding voluntarily.[66]

---

[62] The Petitioner's Request on the Technical Expert's Report is attached to the Tavanti's Declaration as **Exhibit 14**.

[63] The Initial Filing of the Second Enforcement Lawsuit is attached to the Tavanti's Declaration as **Exhibit 6.**

[64] The BCIs n. 10151641 and 10116451 are attached to the Tavanti's Declaration as **Exhibit 3**.

[65] Tavanti's Decl ¶83 and 84.

[66] Tavanti's Decl ¶[85,86.

On August 03, 2022, after Banco Votorantim assigned the credits held against Solar Comércio to Petitioner,[67] the Petitioner also joined the proceeding.  On December 13, 2022, the Petitioner requested the court to pierce the corporate veil on Válter's owned companies, Santa Albana, Idra, and Mônaco.

As also happened in the First Enforcement Lawsuit, the Brazilian district court dismissed the Second Enforcement Lawsuit without prejudice.  After the São Paulo State Court overruled the district court's decision, Válter filed an appeal to the Superior Court of Justice, which was denied by the São Paulo State Court based on its admissibility.  On December 05, 2024, Válter filed an opposition, which was also denied on May 05, 2025.[68]

On May 15, 2025, Válter filed another opposition, which, although accepted by the Superior Court of Justice, did not change the outcome of the judgment.[69]  The deadline for this appeal is currently running.  This appeal, however, does not prevent the Enforcement Lawsuits from continuing. The Enforcement Action has continued through a parallel proceeding named "provisional sentence enforcement proceeding.

**(ii)     The Second Proceeding to Pierce the Corporate Veil.**

The request to pierce the corporate veil for the Debtors and Guarantors companies – Santa Albana, Idra, and Mônaco – was filed on December 13, 2022, as an ancillary proceeding to the Second Enforcement Lawsuit.[70]

---

[67] The Assignment Agreement is attached to the Tavanti's Declaration as **Exhibit 4**.

[68] Tavanti's Decl ¶89.

[69] Tavanti's Decl ¶90.

[70] The Initial Filing of the Second Proceeding to Pierce the Corporate Veil is attached to the Tavanti's Declaration as **Exhibit 8.**

Similarly to the First Proceeding to Pierce the Corporate Veil, the targets are Santa Albana, Idra, and Mônaco, all shell companies incorporated in Brazil and, as described above, used to perform transactions to divert the family's assets.[71]

The request made by the Petitioner was denied on February 03, 2023.  However, after the Petitioner appealed from this decision, the São Paulo State Court granted its appeal on October 29, 2024, and determined that the proceeding should continue.[72]  After some additional evidence was collected by the Petitioner, it filed an amendment to its original request to also include Mataruna as one of the targets of the proceeding.  The amended request was granted on April 03, 2025.[73]

On July 20, 2025, the target companies, Idra, Mônaco, Santa Albana, and Mataruna filed their opposition to the Petitioner's request to pierce the corporate veil.  On July 31, 2025, the court determined the Petitioner to respond to the opposition.[74]

The Second Proceeding to Pierce the Corporate Veil is pending, and the Petitioner may provide the court with additional evidence to demonstrate to the court to shed light on the Guarantors' complex structure to hide their assets under the cover of shell companies.[75]

### C.  <u>The Probate Proceeding</u>

Under Section article 1,784 of the Brazilian Civil Code, a probate proceeding should be initiated to distribute the inheritance of the deceased among his heirs[76].  On August 02, 2018, Mrs. Wanda, Válter's and Ricardo's mother died. On March 04, 2024, Wanda's heirs filed the Probate

---

[71] Tavanti's Decl ¶93.

[72] Tavanti's Decl ¶94.

[73]Tavanti's Decl ¶96.

[74] Tavanti's Decl ¶96.

[75]Tavanti's Decl ¶97.

[76] *See Section 1,784. "Once the probate proceeding is initiated, the inheritance will be transmitted to the legitimate heirs and heirs listed on the will."*

Proceeding before the 8th District of Family and Succession Matters of the São Paulo State Court (the "Probate Court").[77]  Mr. Flávio, Válter's and Ricardo's brother, was named administrator of the estate on March 07, 2024.

Under Article 1,846 of the Brazilian Civil Code, heirs receive equal shares unless they waive their rights. Here, Válter and Ricardo waived their inheritance—apparently to avoid creditor reach—so 50% passed to Flávio and the remaining 50% to Rodrigo Odilon, Mrs. Wanda's widower.[78]

Ordinarily, such a 'donation' would be valid under Brazilian succession law. But when heirs waive their inheritance to prejudice a creditor, the donation has no legal effect and must be annulled.[79]

Therefore, when the Petitioner found that Ricardo and Válter had waived their right to inheritance, it intervened in the Probate Proceeding on May 28, 2024, and requested the Probate Court to annul the partition plan proposed by the heirs.[80]

The request was granted, and a new partition plan was approved by the Probate Court on July 17, 2025, stating that each of the sons was entitled to an equal share of the inheritance, which meant a total of almost R$ 230,000.00 Brazilian *reais* being split among the three children.[81]

### D.  Respondents Possess Highly Material Information For Use in the Foreign Proceedings

---

[77] The initial petition in the Probate Proceeding is attached to the Tavanti's Declaration as **Exhibit 17**.

[78] Tavanti's Decl ¶100.

[79] Tavanti's Decl ¶101.

[80] Tavanti's Decl ¶102

[81] Decision dated July 17, 2025, is attached to the Tavanti's Declaration as **Exhibit 18.**

The evidence obtained will be submitted to the Brazilian courts and relied upon in adjudicating the pending proceedings.

In addition, considering Válter's frequent presence in the United States, as made clear by his social media posts, the Petitioner believes that the discovery to be produced could also demonstrate an additional glimpse of the family's members real amount of assets.

Because CHIPS and FED-NY clear U.S.-dollar wire transfers between international banks, their records can reveal assets and transactions the Guarantors never disclosed to the Brazilian courts. This evidence is highly relevant to show that, for more than a decade, they have concealed assets to defraud creditors, including the Petitioner.

Therefore, the Petitioners request limited documents and information from the Respondents, concerning any assets, accounts, bank statements, financial transaction receipts, asset and portfolio reports, and other financial documents that show the money flows to international financial institutions.

## ARGUMENT

### I.    THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782(a) AND THE *INTEL* DISCRETIONARY FACTORS.

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a pending or "reasonabl[y] contemplate[ed]" foreign proceeding. *Intel*, 542 U.S. at 259. The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782.

An Application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district

court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person". *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2nd Cir. 2012).

After determining that the three statutory requirements are satisfied, the District Court can grant discovery at its discretion. *See In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 78 (2d Cir. 1997).

The Supreme Court has decided on four factors that courts may consider when exercising that discretion: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (iii) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (iv) whether the request is "unduly intrusive or burdensome*." See Intel Corp.,* 542 U.S. at 264-65; accord *In re Doosan Heavy Indus. & Constr. Co., Ltd*., 2020 WL 1864903, at 1 (E.D.N.Y. Apr. 14, 2020).

Moreover, courts in this circuit "evaluate discovery requests under Section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts". *Euromepa S.A. v. R. Esmerian, Inc.,* 51 F.3d 1095, 1097 (2d Cir. 1995); *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discover in aid of foreign and

international proceedings. *See, e.g. Intel,* 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("The statute has, over the years, been given increasingly broad applicability."); *In re Edelman,* 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly….").

A.    **Petitioner Satisfies the Statutory Requirements of 28 U.S.C. § 1782.**

The Petitioner satisfies the three statutory requirements of Section 1782: (1) the Respondents are "found" in the Southern District of New York; (2) the requested information is for use in the Brazilian Proceedings; and (3) Petitioner is an "interested person" because it is a party in the Brazilian Proceedings.

*1.  Respondents Are "Found" in the Southern District of New York.*

Respondents have long standing and long established connections to the Southern District of New York and all have branches, are headquartered and/or have been incorporated in New York. *Hertz Corp. v. Friend,* 559U.S. 77, 81, 93 (2010) (holding that a corporation's principal place of business "should normally be the place where the corporation maintains its headquarters"); *Matter of Fornaciari* for Order to Take Discovery Pursuant to 28 U.S.C. §1782, No. 17MC521, 2018 WL 679884, at *2 (S.D.N.Y.Jan. 29, 2018) (noting that a corporation is found in the district where it is "essentially at home*"); Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.,* No. 17-MC-00216(VEC), 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is 'at home' for the 28 purpose of constitutional due process only in a state that is the corporation's place of incorporation or its principal place of business.") (quoting Daimler AG v. Bauman, 571 U.S. 117, 139 n. 19(2014)) (emphasis added); In re Lane, No. 22 MISC. 34 (LGS), 2022 WL 16737132, at *2m(S.D.N.Y. Nov. 7, 2022) (holding that respondents headquartered in Manhattan reside or are found under Section 1782).

Therefore, the Respondents are found within the Southern District of New York for this requirement of Section 1782. Accordingly, this statutory factor is satisfied. Accordingly, the first statutory requirement is satisfied.

### 2. *The Requested Discovery is "For Use" In a Foreign Proceeding.*

The information sought in the proposed subpoenas is "for use" in foreign proceedings within the meaning of 28 U.S.C. § 1782.

Discovery is considered "for use" where there is an ongoing foreign proceeding that is adjudicative in nature. *See Euromepa S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). The Foreign Proceedings satisfy this requirement. They are civil, judicial proceedings currently pending before Brazilian courts and therefore qualify as proceedings before a "foreign or international tribunal" under Section 1782.

Courts have repeatedly recognized that civil proceedings in Brazil fall within the scope of Section 1782[82].

Courts in this District have likewise made clear that discovery satisfies the "for use" requirement where it will assist a foreign court in evaluating disputed facts, tracing assets, or assessing the accuracy of financial representations. *See, e.g.*, *In re Bourkalova*, No. 1:23-mc-____ (S.D.N.Y.) (authorizing § 1782 discovery for use in proceedings pending before the High Court of Justice of England and Wales to trace assets and test the accuracy of representations concerning financial capacity).

---

[82] *See, e.g.*, *In re Pimenta*, 942 F. Supp. 2d 1282 (S.D. Fla. 2013); *In re Ibiuna Credito Gestao de Recursos Ltda.*, No. 24-MC-13 (JGK), 2024 WL 1076940 (S.D.N.Y. Mar. 11, 2024); *In re Lane*, 2022 WL 16737132, at *2 (S.D.N.Y. Nov. 7, 2022).

Here, the requested discovery will be used directly in the Brazilian Enforcement Lawsuits and in the Proceedings to Pierce the Corporate Veil. It will assist the Brazilian courts in determining the existence, location, and control of assets relevant to those proceedings.

Specifically, the discovery is necessary to assess the accuracy of representations made by the Mesquita family regarding their financial condition. Petitioners contend that the Mesquita family has represented to Brazilian courts that it lacks sufficient assets, while funds and financial resources have been transferred through foreign accounts and structures outside the visibility of those courts. The requested discovery will permit the Petitioners to test the accuracy of those representations and to present a complete and accurate factual record to the Brazilian tribunals.

Second, the Circuit law does not require a petitioner to show that the requested information would be discoverable or admissible in the foreign proceedings.[83]

The petitioner need only demonstrate the practical ability to place the evidence, or the information it contains, before the foreign tribunal.[84]

That standard is satisfied here. The transactions at issue were conducted in U.S. dollars and routed through accounts, institutions, or intermediaries located outside Brazil, including in the United States. As a practical matter, this information cannot be obtained through Brazilian discovery mechanisms alone.

Accordingly, the discovery sought is plainly "for use" in the Foreign Proceedings within the meaning of Section 1782.

Therefore, the Petitioner satisfies this requirement.

---

[83] *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012).

[84] *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

### 3.   Petitioner is an "Interested Person".

Finally, Section 1782 requires the applicant to establish that it is an "interested person" and that the discovery sought is intended for use in a foreign proceeding. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256.  Petitioner is the claimant (and creditor) in the pending Foreign Proceedings, and is, therefore, an 'interested person" under to Section 1782.

### B.   Discretionary Factors Weigh in Favor of Petitioner's Application.

Once the statutory requirements of Section 1782 have been met, courts next use their discretion in granting by considering four factors set forth by the Supreme Court in *Intel*.  Here, each of the *Intel* factors weighs in favor of granting the Application.

Furthermore, when exercising their discretion, courts should consider the twin aims of Section 1782, namely, "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.[85]"

### 1.   Respondents Are Not and Will Not Be Participants in the Brazilian Proceedings.

"The first discretionary factor asks the Court to evaluate whether the documents or testimony sought by the application are within the foreign tribunal's jurisdictional reach, and thus accessible without resort to § 1782".  *In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in Foreign Proceeding,* 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015).

---

[85] *KPMG, L.L.P.,* 798 F.3d at 117

Courts typically find that where the target of discovery is not a party to the underlying litigation, this factor weighs in favor of granting the application[86].

Here, the Respondents are not parties to the Foreign Proceedings and are beyond the subpoena powers of Brazilian courts, which are limited to the creditor (the Petitioner) and the Debtors and Guarantors. Therefore, there is no foreseeable danger in obtaining evidence from the financial institutions in New York, since obtaining the evidence will in no way disrupt or interfere with the Brazilian Proceedings.

The first *Intel* factor therefore weighs in favor of discovery.

### 2. The Brazilian Court is Receptive to U.S Judicial Assistance.

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782. *See In re Application of OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782").

There is every reason to expect that the Brazilian courts presiding over the Foreign Proceedings will be receptive to the evidence sought here.[87]  The Petitioner's requests to the Respondents fully respect Brazil's proof-gathering rules and policies and do not seek to circumvent any foreign procedure, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district

---

[86] *See Gorsoan Ltd. V. Bullock,* 652 F. App'x 7, 9 (2d Cir. 2016) ("Indisputably, Remmel, Smith, and RIGroup are not parties to the Cyprus proceedings, and so the first *Intel* factor weighs in favor of discovery against them."); *In re BNP Paribas Jersey Tr. Corp. Ltd. for an Order Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in Foreign Proceedings,* No. 18-MC-00047 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018).
[87] Tavanti's Decl ¶104, 105.

courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).

A court should deny discovery based on lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added)[88].

As stated in the Tavanti's Declaration, the Brazilian courts are receptive to assistance from U.S. District Courts in terms of gathering relevant evidence for use in proceedings pending before them.[89]  Therefore, there is no reason to believe that the Brazilian court would reject evidence produced with this Application.

U.S. courts have repeatedly recognized that discovery obtained in the United States may be used appropriately in proceedings before Brazilian courts.

As also noted in the Tavanti's Declaration, the Brazilian Superior Court of Justice has previously held that bank records obtained in this District under U.S. law may be used in Brazilian proceedings without violating defendants' rights.[90]

Thus, the second *Intel* factor weighs in favor of granting the Application.

### 3.  *This Application Does Not Circumvent the Rules of the Brazilian Authorities and Courts.*

This Application does not "attempt to circumvent" proof-gathering restrictions of the Brazilian courts; thus, the third discretionary factor also weighs in favor of granting discovery. *Intel,* 542 U.S. at 264-65.  For purposes of this inquiry, proof-gathering restrictions "are best

---

[88] *See in re Safra*, 2022 WL 3584541, at *5 ("objection to U.S. federal-court judicial assistance would have to come from an official source, such as an agent of the [foreign] government."); *Schmitz*, 376 F.3d at 84 (district court denied discovery request where German Ministry of Justice and local German prosecutor explicitly asked district court to deny it).

[89] Tavanti's Decl ¶ 106.

[90] The STJ Decision is attached to the Tavanti's Declaration as **Exhibit 19.**

understood as rules akin to privileges that prohibit the acquisition or use of certain materials, rather than as rules that fail to facilitate investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information.[91]

Intel makes clear that §1782 does not require evidence to be discoverable in the Foreign Proceedings, and the Second Circuit has held it need not be admissible either[92]. Nor must a petitioner exhaust foreign remedies first.[93]

There are no prohibitions arising from Brazilian laws, and/or public policies, or specifically from the Brazilian court that limit Petitioner's rights to bring evidence obtained in the United States to the Brazilian Proceedings.[94] *In re Banco Santander*, 2022 WL 1546663, at *2.

Moreover, as also demonstrated above, courts in this District have previously granted applications aimed at producing bank information evidence for use in Brazilian proceedings, with no evidence of these applications representing an attempt to circumvent Brazilian proof-gathering restriction rules.[95]

Therefore, the third *Intel* factor weighs heavily in favor of granting Petitioner's Application.

### 4. *The Application is Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure*

---

[91] *See in re Accent Delight Int'l Ltd.,* No. 16-MC-125 (JMF), 2018, WL 2849724, at * 4 (S.D.N.Y. June 11, 2018) (quoting *Mees*, 793 F.3d at 303 n. 20).

[92] *See Brandi-Dohrn,* 673 F.3d at 82; *Intel*, 542 U.S. at 261.

[93] *See* Metallgesellschaft, 121 F.3d at 79.

[94] Tavanti's Decl ¶112.

[95] *See e.g. In Re Ibiúna Crédito Gestão de Recursos Ltda.,* No. CV24MC0013JGKRFT, 2024 WL 1077559, at *8 (S.D.N.Y. Feb. 14, 2024) *report and recommendation adopted sub nom. Ibiuna Credito Gestao de Recursos Ltda v. Goldman Sachs Group Inc.,* No. 24-MC-13 (JGK), 2024 WL 1076940 (S.D.N.Y. Mar. 11, 2024); "There is no evidence that SPS is attempting to circumvent any proof-gathering restrictions imposed by Brazilian law or otherwise seeking the discovery in bad faith*". In re SPS I Fundo de Investimento de Acoes - Investimento no Exterior,* No. 22-MC-00118 (LAK), 2022 WL 17553067, at *8 (S.D.N.Y. Dec. 9, 2022).

Finally, the fourth *Intel* factor favors granting discovery because the Application is narrowly tailored to include only relevant, non-privileged information and avoid any undue burden on Respondents.[96] Under a Section 1782 discovery order, relevancy is defined as any information that "bears on or reasonably could lead to other matter that could bear on" the Applicant's claims or defenses in the foreign action.[97]

The requested discovery would not be unduly burdensome for the Respondents to produce, as the requests are targeted in scope and are of the type regularly maintained by and easily accessible to CHIPS and to FED-NY. *See e.g. In re Bourlakova*, No. 24-MC-71 (JPO), 2024 WL 4839047, at *4 (S.D.N.Y. Nov. 20, 2024), *aff'd*, No. 24-3187-CV, 2025 WL 1733495 (2d Cir. June 23, 2025) (applicants requested evidence concerning *ten* individuals, *thirty-eight* entities, and nearly a hundred accounts in a period of seven years); *In re W. Afr. Min. Trading Ltd.,* No. 24 MISC. 114 (DEH), 2024 WL 3862293, at *5 (S.D.N.Y. Aug. 19, 2024) (finding that financial statements and records related to wire transactions involving parties to the foreign proceedings are routinely subpoenaed in litigation and therefore proportionate, representing minimal burden for Respondents).

Because the requested discovery (1) seeks material, non-privileged documents and information collected by the Respondents in connection with transactions performed by the Mesquita family members and their affiliated entities; (2) is limited by date and transaction-type; (3) is maintained in the normal course of business by the Respondents; and (4) is sufficiently

---

[96] "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302 (citing *In re Edelman*, 295 F.3d at 179 ("Limits may be proscribed on [§ 1782] discovery or an existing order may be quashed under Rule 26(c).")).

[97] *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) (internal citations and quotation marks omitted).

specific to allow the Respondents to conduct targeted searches to identify and produce the documents and information with minimal burden, it is not possible to affirm that it is unduly burdensome nor intrusive.

In the unlikely event, however, that this Application and the desired discovery create a burden or other issues for one of the Respondents, Petitioner would be more than willing to accommodate and confer with them to resolve any such issues in good faith. *See, e.g. In re Bernal*, 18-21951-MC, 2018 WL 6620085 (S.D. Fla. Dec. 18, 2018) ("As for the concern over the production of sensitive personal and financial information, there is no reason why a stipulated protective order cannot be mutually agreed upon that would limit any use of the items produced for consideration in the foreign proceeding."); *see also Porsche Automobil Holding*, 2016 WL 702327, at *9 (quoting Mees, 793 F.3d at 302).

## II.    THE PETITIONER SEEKS THE APPLICATION TO BE GRANTED *EX PARTE*

It is not uncommon for District Courts to grant Applications made pursuant to § 1782 *ex parte*. Courts in this Circuit and across the country have recognized that Section 1782 applications made on an *ex parte* basis are properly filed and routinely granted.[98]  *In re JSC BTA Bank*, 577 F. Supp. 3d at 268. Such applications are "customarily received and appropriate action taken with respect thereto *ex parte*" because "witnesses can raise objections and exercise their due process rights my motions to quash the subpoenas."[99]

---

[98] *See e.g.*, *Esses v. Hanania (In re Esses)*, 101 F.3d 873, 874 (2d Cir. 1996) (affirming grant of ex parte order under Section 1782); *In re Application of Gianoli*, 3 F.3d 54, 55 (2d Cir. 1993) (same); *see also In re Mota*, No. MC 19-00369 (MN), 2020 WL 95493, at *1 (D. Del. Jan. 8, 2020) ("Discovery applications under § 1782 are often granted *ex parte*").

[99] *See Gushlak v. Gushlak*, 486 F. App'x 215 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."); *In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991) ("Indeed, such *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery taken pursuant to the request, and will then have the opportunity to move to quash the discovery or to participate in it.").

Here Petitioner requests that its *ex parte* Application be granted without prejudice to Respondents' rights to move to vacate this Court's approval order and/or quash the subpoenas Petitioners would issue thereunder.  Therefore, the request made by Petitioner is not extraordinary and it complies with District Courts' precedents. *See Gushlak v. Gushlak,* 486 Fed.Appx. 215, 217 (2d Cir. 2012).

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the Ex *Parte* Application and Petition for an Order to Conduct Discovery; (b) enter the Proposed Order attached hereto as Exhibit A, (c) authorize Petitioner, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas on Respondents attached hereto as Exhibit B; and (d) grant such other and further relief as the Court deems just and proper.

Dated: January 7, 2026.
New York, New York

Respectfully submitted,
**MB SCANLON PLLC**
*/s/ Gabriela Menna Barreto Scanlon*
Gabriela M. B. Scanlon
4301 50th Street, N.W, 1st Floor
Washington, D.C. 20016
Tel: +1 215    459-1171
Email: gabriela@mbscanlon.com
*Counsel for Petitioner Fundo de Investimento em Direitos Creditórios Não Padronizados.*

30